Nancy **RUTIGLIANO, Plaintiff,**

v.

**VALLEY BUSINESS FORMS, et al., Defendants.**

**Civil Action No. 90–1432 (JCL).**

United States District Court,
D. New Jersey.

June 27, 1996.

August J. Landi, Shrewsbury, NJ, for Plaintiff.

Anita Ruth Hotchkiss, Porzio, Bromberg & Newman, Morristown, NJ, Joseph D. Rasnek, Carpenter, Bennett & Morrissey, Newark, NJ, Linton W. Turner, Jr., Crawshaw & Mayfield, Cherry Hill, NJ, for Defendants.

## OPINION

LIFLAND, District Judge.

Plaintiff Nancy Rutigliano initiated this action in 1990 against various manufacturers and distributors of carbonless carbon paper ("CCP") forms. Rutigliano alleges that she has developed a condition called "formaldehyde sensitization" from exposure to formaldehyde released from CCP she handled in the course of her employment at Metro Fuel Oil Company ("Metro") in Ridgefield, New Jersey from January 1984 through December 1985. Formaldehyde sensitization, she claims, is a severe and permanent disability which requires her to live and work in environments free of formaldehyde, a ubiquitous chemical in today's society.

Discovery has resulted in dismissal of all but two defendants: Appleton Papers, Inc. ("Appleton") and Mead Corporation ("Mead"). *See* Stipulation of Defendants Appleton Papers Inc. and the Mead Corporation as to Product Identification. Appleton and Mead now move to bar the testimony of plaintiff's expert witnesses, Elaine B. Panitz, M.D. and Thaddeus J. Godish, Ph.D. Because the proposed testimony of these experts is inadmissible, defendants argue, Rutigliano is unable to establish that she suffers from formaldehyde sensitization or that her alleged injuries were caused by use of defendants' CCP. Therefore, Appleton and Mead also move for summary judgment at this time.

■ The Court heard oral argument on November 27, 1995. The parties have submitted copious medical information and deposition testimony in conjunction with this motion, which the Court has reviewed at length. Neither party requested that the Court conduct an evidentiary hearing. Nor did the Court judge that such a hearing would enhance its ability to decide this motion, given the completeness of the written record presented to the Court. As the Third Circuit has noted:

> Evaluating the reliability of scientific methodologies and data does not generally involve assessing the truthfulness of the expert witness and thus is often not significantly more difficult on a cold record.

*In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 749 (3d Cir.1994), *cert. denied, sub nom General Elec. Co. v. Ingram*, —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Accordingly, the Court proceeds to consider this matter on the written record, in light of counsel's written and oral arguments.

Plaintiff has alleged that she contracted "formaldehyde sensitization" as a result of handling carbonless carbon paper manufactured by defendants during the course of her employment at Metro Fuel Oil Company. Dr. Panitz offers testimony that use of CCP can cause formaldehyde sensitization, that Rutigliano suffers from formaldehyde sensitization, and that this sensitization was caused by defendants' CCP. However, she has failed to demonstrate that her conclusions are supported by "good science," as required by the evidentiary analysis set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and subsequent case law. The Court will not allow a jury to hear her testimony. As this leaves plaintiff without admissible evidence that her alleged injury was caused by defendants' products, the Court will also grant summary judgment in favor of defendants. The Court need not reach the admissibility of Dr. Godish's testimony, which does not include an opinion as to causation, and the case will be dismissed in its entirety.

### Background

Dr. Panitz is an occupational physician who works primarily as a consultant and expert witness in litigation matters. She does not have specialized knowledge in the fields of immunology, toxicology or dermatology. She first diagnosed plaintiff with formaldehyde sensitization in 1990, and has coordinated and interpreted plaintiff's medical testing since that time. She does not treat plaintiff herself. Dr. Panitz has neither visited nor tested any of plaintiff's present or previous home or work environments.

Formaldehyde is a naturally-occurring chemical that is nearly ubiquitous in our society. Formaldehyde is present in automobile exhaust, cigarette smoke (both primary and secondary), building materials, glues and many other common products. It is one of over fifty chemicals employed in the production of CCP. "Formaldehyde sensitization," according to Dr. Panitz, is an allergic condition that may result from short-term, high-dose exposure to formaldehyde or from long-term, low-dose exposure. When a sensitized person is exposed to formaldehyde, even at very low levels, she may experience any of a panoply of symptoms, including tight throat, rhinitis, skin rash, headache, fatigue and depression. Plaintiff argues that her formaldehyde sensitization is so severe that she cannot work in an office, in a retail operation, or outdoors.

Dr. Panitz diagnosed plaintiff with formaldehyde sensitization during her initial office visit, which consisted mainly of Rutigliano's

self-report of her symptomatology, and medical, family and work history. Dr. Panitz also performed spirometry on plaintiff at this initial office visit. Subsequent to the first visit and diagnosis, Dr. Panitz has had plaintiff's blood tested for formaldehyde antibodies on numerous occasions. Plaintiff has also undergone extensive allergy testing by a variety of specialists and has received additional spirometry. Dr. Panitz contends that the results of these tests support her original diagnosis of formaldehyde sensitization.

### Applicable Law

 Plaintiff has asserted claims of failure to warn, strict liability, negligence and gross negligence. Causation is a fundamental element of each of plaintiff's claims. *See, e.g., Habecker v. Copperloy Corp.*, 893 F.2d 49, 54 (3d Cir.1990); Restatement (Second) of Torts (1965) § 430. Plaintiff's case requires expert testimony to satisfy her burden with respect to both general causation and specific causation. *See DeLuca by DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 958 (3d Cir.1990) (testimony must be able to support a jury finding both (i) that the drug can produce birth defects and (ii) that the drug more likely than not caused the birth defects in this particular case), *on remand* 791 F.Supp. 1042 (D.N.J.1992), *aff'd*, 6 F.3d 778 (3d Cir.1993), *cert. denied*, 510 U.S. 1044, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); *see In re Agent Orange Product Liability Lit.*, 611 F.Supp. 1223, 1250 (E.D.N.Y.1985) (to prove specific causation, plaintiff's expert must first prove general causation and then exclude other possible causes for the plaintiff's injury), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988). In this case, "general causation" addresses whether formaldehyde found in defendants' carbonless carbon paper is capable of causing sensitization in persons handling that paper in the course of their work. "Specific causation" addresses whether formaldehyde from defendants' CCP did cause Rutigliano's symptomatology.

 If plaintiff's expert opinion evidence regarding causation is inadmissible or insufficient to sustain a jury verdict in her favor, summary judgment must be granted to defendants. *Fed.R.Civ.P.* 56(c); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

 Where, as here, essential elements of plaintiff's case are entirely dependent upon expert testimony, the trial judge must act as a "gatekeeper" to ensure that all expert testimony or evidence to be heard at trial is not only relevant, but also reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–91, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). The Supreme Court and the Court of Appeals for the Third Circuit have set forth nonexclusive guidelines to shape the gatekeeper's analysis under the relevant rules of evidence: Rules 702, 703 and 403. The crucial portion of the analysis in the case at bar relates to the standards established under Rule 702.

Federal Rule of Evidence 702 requires that expert opinion testimony be rendered by a qualified expert, based upon reliable data and methodology. The testimony must be relevant to the case at hand. The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The three requirements established by Rule 702 are often referred to as qualification, reliability and fit. *See Paoli*, 35 F.3d at 741–42. Although defendants assert that Dr. Panitz's testimony fails to satisfy any of these requirements, the Court finds that the most critical flaws in her testimony lie in the unreliability of her diagnostic method, which renders her opinion as to both general and specific causation inadmissible. As Dr. Panitz's testimony falters on the reliability prong of the Rule 702 test, the Court will not reach the issues of qualification and fit.

■ The Supreme Court emphasized the importance of the expert's methodology in *Daubert*:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592, 113 S.Ct. at 2796. The Court explained that the "overarching subject is the scientific validity—and thus the evidentiary relevance and reliability"—of the principles that underlie a proposed submission. *Id. Daubert* listed five non-exclusive factors for consideration when determining reliability. *Id.* at 591–95, 113 S.Ct. at 2796–97. The Court of Appeals expanded this list in *Paoli.* 35 F.3d at 742 n. 8. When determining reliability, the Court may consider the following aspects of an expert's methodology:

(1) Whether the method consists of a testable hypothesis.

(2) Whether the method has been peer reviewed.

(3) The known or potential rate of error of the method.

(4) The standards controlling the technique's operation.

(5) The general acceptance of the method.

(6) The relation of the technique to accepted methods.

(7) The qualifications of the witness.

(8) Whether the method has been put to non-judicial uses.

The *Paoli* court synthesized these considerations as follows:

The ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching *accurate* results.

*Id.* at 744 (emphasis added).

■ The *Paoli* court stressed that an expert's conclusions must be supported by good grounds in each step of the analysis: "*any* step that renders the analysis unreliable under the *Daubert* factors renders the experts' testimony inadmissible." *Id.* at 745. The expert proposing to testify must demonstrate by a preponderance of the evidence that her opinions are reliable. *Id.* at 744.

### General Causation

■ Dr. Panitz must demonstrate that she utilized a reliable scientific methodology to determine that exposure to ambient formaldehyde can cause formaldehyde sensitization, which manifests itself through the symptoms exhibited by plaintiff. *See DeLuca,* 911 F.2d at 958.

Dr. Panitz provides no testable support for her theory that CCP use can lead to formaldehyde sensitization. While she argues that the blood and skin tests conducted on plaintiff are repeatable, one individual's positive blood and skin tests cannot prove general causation. Indeed, positive blood and skin tests are meaningless in the absence of conclusive studies demonstrating that CCP can cause formaldehyde sensitization, and that such sensitization is revealed by positive blood and skin test. The fact that Dr. Panitz's theory is not testable weighs against its admissibility.

Dr. Panitz bases her theory on re-analysis of numerous medical studies that found no connection between CCP use and any reaction greater than irritation.[1] Dr. Panitz has admitted that she is not aware of a single study whose results support her conclusion that CCP use causes formaldehyde sensitization. Panitz Dep. at 80. The use of publish-

---

**1.** Sensitization and irritation are distinct reactions. Irritation develops upon exposure, and symptoms rectify themselves quickly when exposure ends. Irritation reactions do not become more severe as the number of exposures increas-

es. Sensitization, on the other hand, grows increasingly worse with continued exposure. The symptoms of sensitization grow more severe, and may not dissipate as quickly as those of an irritant reaction.

ed data and anecdotal reports from studies not related to the issue of formaldehyde sensitization is contrary to the methods accepted by the scientific community. Waddell Aff. at Da 621–27 ¶ 19, 31. Nor would credentialed allergists or immunologists rely upon data extrapolated from articles to support conclusions not drawn by the articles' authors. *Id.*

█ The case law also warns against use of medical literature to draw conclusions not drawn in the literature itself. For instance, in *Wade–Greaux v. Whitehall Laboratories, Inc.,* 874 F.Supp. 1441 (D.V.I.1994), *aff'd* 46 F.3d 1120 (3d Cir.1994), the proposed experts attempted to rely upon data gleaned from articles whose conclusions did not support the experts' theories. The court noted that each study had express limitations and cautions, and that the experts could not reliably utilize these articles to support their conclusions as to general causation. *Id.* at 1456, 1468. Not a single one of the articles studying CCP on which Dr. Panitz bases her theory concluded that CCP can cause formaldehyde sensitization. Panitz Dep. at 80.[2] Reliance upon medical literature for conclusions not drawn therein is not an accepted scientific methodology. *See* Waddell Aff. ¶ 31. Dr. Panitz's method is not generally accepted by the scientific community.

█ Dr. Panitz has not supplemented this absence of support for her theory by conducting experiments and publishing peer reviewed articles of her own regarding CCP or formaldehyde sensitization. "Publication" (which is but one element of peer review) is not a '*sine qua non*' of admissibility … But submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected. *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2797. Viable theories may evade publication because they are too new, too particular, or of too limited interest to be published. *Id.*

Copious literature has been generated and published on the health effects of CCP use. *See* Defendants' Joint Appendix at 731–1035. Therefore, the Court cannot find that the topic is too new, too particular or of too limited interest to be published. Indeed, Dr. Panitz has never attempted to obtain peer review of her theory, and has no intention of doing so. Panitz Dep. at 105–06. In light of the copious peer-reviewed literature determining that CCP does not cause the injuries that Dr. Panitz wishes to testify that it has caused, Dr. Panitz's failure to seek or obtain peer review of her theory weighs heavily against the reliability of her methods.

█ Indeed, it appears that Dr. Panitz has not tested her theory that CCP use can cause formaldehyde sensitization anywhere outside the judicial arena. Dr. Panitz is a professional forensic expert who has participated in hundreds of litigations between 1983 and the present. Panitz Dep. Ex. Da–42; Panitz Dep., *White v. Merck & Co., Inc.,* 6/12/19 at 80. Most of the cases Dr. Panitz evaluates become involved in the legal system. Panitz Dep. at 269. Where a heavily-

---

2. Dr. Panitz also attempts to rely upon general medical principles regarding development of immunity and sensitization in humans. For instance, Dr. Panitz relies upon the Textbook of Medical Physiology 74 (6th Ed.1981), Arthur C. Guyton, for the proposition that: "In addition to its innate immunity, the human body also has the ability to develop extremely powerful specific immunity against individual invading agents such as lethal bacteria, viruses, toxins and even foreign tissues from other animals. This is called acquired immunity or adaptive immunity."

Dr. Panitz does not explain how this general principle of immunity supports her conclusion. A general principle that sensitization can occur, without more, is not adequate to support Dr. Panitz's specific conclusion that formaldehyde released from CCP can cause sensitization. Fur-

thermore, the article of Thrasher, et al. entitled Evidence for Formaldehyde Antibodies and Altered Cellular Immunity in Subjects Exposed to Formaldehyde in Mobile Homes, concludes only that persons exposed to formaldehyde may develop antibodies. 42 Archives of Environmental Health 347 (1987). It does not, as Dr. Panitz suggests, conclude that persons with antibodies have formaldehyde sensitization. Indeed, another article upon which Dr. Panitz attempts to rely concluded that there was no correlation between the presence of formaldehyde antibodies in the test subjects and the presence of symptoms of irritation. Patterson, et al., IgG antibody against formaldehyde human serum proteins: A comparison with other IgG antibodies against inhalant proteins and reactive chemicals, 84 J. of Allergy and Clinical Immunology 359 at 365 (1989).

litigated "scientific" theory is not presented for testing by the medical community's peer-review mechanisms, a court may conclude that "what's going on here is not science at all, but litigation." *Daubert*, 43 F.3d 1311, 1318 (9th Cir.1995) (on remand).

The remaining factors concerning the validity of Dr. Panitz's methods, (namely: Panitz's expertise, rates of error, control mechanisms, and relation to accepted methods), are discussed more fully below. Suffice it say, at this point, that these factors, like the others discussed above, demonstrate that Dr. Panitz's testimony is not reliable, and would not assist the trier of fact in reaching an accurate result. *Paoli*, 35 F.3d at 744.

■■■ Dr. Panitz appeals again and again to her "expertise and experience" dealing with occupational illness. *See, e.g.,* Panitz Dep. at 106. Where a doctor's conclusion is based upon subjective experience and perceptions, it is not of the type that can be tested by other doctors in order to determine its validity. "The statements constituting a scientific explanation must be capable of empirical testing." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2797 (citation omitted). Dr. Panitz's conclusions derive from her unquantifiable personal experience and instinct, not from scientific theory and reasoning. This is not the type of expert scientific reasoning that the Court may submit to a jury.

### Specific Causation

■■ The unreliability of Dr. Panitz's opinion as to general causation is sufficient to render her testimony inadmissible. *Paoli*, 35 F.3d at 745. However, even if she had succeeded in demonstrating that her conclusion as to general causation is based on scientifically acceptable methodology, the Court could not permit her opinion as to specific causation to be submitted to a jury. Like her general causation theory, Dr. Panitz's theory that Rutigliano's CCP use caused her symptoms is not based on reliable scientific methods.

■■ Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis—that is, the process of eliminating other possible diagnoses. This very issue arose in *Daubert*. The Ninth Circuit, applying the Supreme Court's analysis, rejected expert testimony that the product Bendectin caused birth defects in plaintiffs:

> Dr. Palmer offers no tested or testable theory to explain how ... he was able to eliminate all other potential causes of birth defects, nor does he explain how he alone can state as a fact that Bendectin caused plaintiff's injuries ... Dr. Palmer does not testify on the basis of the collective view of his scientific discipline, nor does he take issue with his peers and explain the grounds for his differences ... Personal opinion, not science, is testifying here.

*Daubert*, 43 F.3d at 1319.

Likewise, in *Paoli*, the Third Circuit did not permit expert testimony that plaintiffs' injuries were caused by polychlorinated biphenyls ("PCB"s) because the expert neither engaged in standard diagnostic techniques nor offered good grounds for concluding that his atypical methods were reliable. 35 F.3d at 763. In particular, the expert attributed all of plaintiffs' symptoms to PCB exposure without conducting the medical inquiries and tests required to eliminate other causes, such as use of oral contraceptives and alcohol. *Id.* n. 33. The expert also failed to consider alternative causes of the plaintiff's positive liver function tests. *Id.* The court concluded:

> Dr. DiGregorio did not point to any evidence showing that PCB exposure was so likely to produce the type of illness the plaintiffs had in comparison to other possible causes to which plaintiffs had likely been exposed that it was reliable to conclude that PCBs were the cause without further "analysis." *Id.* at 763–64.

Other courts in this district consistently emphasize that expert testimony concerning causation will not assist the trier of fact in reaching an accurate result unless the expert has eliminated alternative explanations for the plaintiff's illness. In *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358 (D.N.J.1995), the court rejected expert testimony that work place exposure to platinum salts caused

plaintiff to contract asthma. The court reasoned:

> The major flaw in Dr. Auerbach's opinion on specific causation is ... his method of eliminating other possible causes of Diaz's asthma. Persistent asthma is an extremely common affliction that has multiple physical, and maybe emotional causes. A meaningful diagnosis of specific causation must specifically negate other possible causes.

*Id.* at 376. In particular, the expert could not explain how he accounted for plaintiff's (1) lung problems prior to his employment by the defendant, (2) abnormal lung activity tests predating his employment, (3) family history of respiratory problems, (4) history of smoking, (5) possible exposure to other industrial allergens prior to working for defendant, and (6) indications of allergies to other common substances. *Id.* 376–77. Because the expert could not satisfy his burden of demonstrating that his methodology was reliable, his testimony was barred. *Id.* at 377. *See also Wade–Greaux,* 874 F.Supp. at 1441.

### Alternative Diagnoses

The record is replete with evidence, including Dr. Panitz's own admissions, that Rutigliano's symptoms could be attributable to medical conditions other than formaldehyde sensitization. In 1987, Rutigliano was diagnosed by her treating internist, Dr. Sheila Fields, as having evidence of Epstein–Barr virus, a virus characterized by muscle pains, joint pains, low grade fever, marked fatigue, depression, and sore throats. Rutigliano subsequently consulted Dr. Steinberg at New York Hospital who, based on positive blood tests, confirmed Fields' diagnosis of chronic Epstein–Barr virus.

At deposition, Dr. Panitz was questioned regarding her rejection of this diagnosis. She explained that Rutigliano had repeated this diagnosis to her at their initial meeting, but that she immediately rejected it:

> A. ... I told her I did not think she had chronic EB Virus Syndrome.

Q. What led you to that conclusion, that she did not have chronic EB Virus Syndrome?

A. Because I believe that her illness was entirely explainable based on her occupational exposures to that carbonless paper.

Q. Did you include EB Virus Syndrome in your differential diagnosis?

A. I don't believe so.

Q. Why not?

A. Well, I didn't believe the diagnosis. I don't believe it was a correct diagnosis.

Q. Were there any scientific reasons why you did not believe that?

A. Well, I don't believe that the physician proved that she had EB Virus Syndrome. I'm not sure what EB Virus Syndrome is. The medical literature is rather controversial on the issue.

Panitz Dep. at 74:2–20. This testimony clearly demonstrates that Dr. Panitz moved from diagnosis to analysis, rather than from analysis to diagnosis. Dr. Panitz testified that she had only reviewed the literature on Epstein–Barr virus intermittently, and that she had not reviewed it at all in relation to this case. *Id.* at 155. Nonetheless, she dismissed the possibility that Rutigliano's symptoms resulted from Epstein–Barr virus, terming it a "waste-basket" diagnosis. *Id.*

Dr. Panitz also acknowledges that plaintiff is sensitized to abitol, Panitz Dep. at 778, an organic alcohol derived from wood resin.[3] According to Dr. David E. Cohen, a dermatologist who tested Rutigliano, abitol is a common substance in paper and is also used in adhesives, inks, sealants, plasticizers and plastic material, and occasionally in mascara. Cohen Report 11/18/94. Dr. Panitz has provided no explanation why she believes that the symptoms plaintiff suffers are not caused by her abitol sensitization as opposed to a sensitization to formaldehyde.

### Skin Testing

Dr. Panitz has also failed to account for numerous objective indications that Rutigliano is not sensitized to formaldehyde. For instance, the extensive and repeated allergy testing performed on Rutigliano consistently

---

3. Dr. Panitz also admits that plaintiff suffers allergies to a variety of other chemicals, including fragrance, para phenylenediamine, and neomycin sulfate. Panitz Dep. at 781–84.

showed no allergic response to formaldehyde. On June 18, 1988, Rutigliano was patch tested with formaldehyde and CCP. She showed no reaction to either one at three or five days. Three years later, on June 3, 1991, Rutigliano was patch tested for allergies to approximately twenty-five chemicals known to be common sensitizers, including 1% formaldehyde and formaldehyde-releasing chemicals and resins. Plaintiff showed no reaction at half-an-hour to formaldehyde applied directly to her skin, no reaction to patched areas at 48 or 72 hours, and no reaction at any time to any of the formaldehyde containing substances. The tests were performed by Dr. Ernesto Gonzalez, a Board-certified dermatologist practicing at Harvard Medical School. Dr. Gonzalez concluded that the only positive result of the testing was a "possible contact dermatitis to fragrance" and that there was "no evidence of contact hypersensitivity to formaldehyde or formaldehyde resin." Gonzalez Dep. at 20:14–21:19; Gonzalez report, 6/16/91. Dr. Gonzalez tested plaintiff again on February 3, 1992, this time to a wider array of substances, once again including formaldehyde. Plaintiff showed a "weak reaction" to a piece of "work boot" but no reaction to formaldehyde. Gonzalez Dep. at 27:15–28:14.

On May 10, 1994, plaintiff was tested for allergies by Dr. Donald Belsito, a Board-certified dermatologist with the Contact Dermatitis Section of the Skin and Cancer Unit at New York University Medical Center. Dr. Belsito patch tested plaintiff to ninety-seven different substances, including various formaldehyde-containing substances (urea formaldehyde, melamine formaldehyde,

DETA, and HMTA), as well as CCP. Dr. Belsito read the patches at forty-eight hours and five days, but found no reaction to formaldehyde-containing substances or CCP. Dr. Belsito concluded that the tests showed no evidence for allergy to any substance except fragrance. Belsito Report, 5/17/94.[4]

Subsequent to this series of negative patch tests for formaldehyde sensitivity, Rutigliano was tested by Dr. Maury Goldman of Harvard Medical School. Rather than applying patches, Dr. Goldman conducted prick and scratch tests, which introduce the tested substances under the subject's skin. Plaintiff was prick tested to formalin (formaldehyde) 1% and 10% solutions and HMTA 1% and 10% solutions. She was also scratch tested with a Metro CCP fuel oil delivery mailer. Dr. Goldman saw no reaction to the Metro CCP, or the 1% or 10% HMTA or to the 1% formalin solution. Plaintiff did react to the prick with 10% formalin with a 1 to 2 millimeter area of redness on her skin.[5]

On November 14, 1994, plaintiff was patch, prick and scratch tested to over one hundred chemicals and CCP by Dr. David Cohen, a dermatologist at New York University. Plaintiff had negative patch tests to all formaldehyde-containing substances, but had a positive patch test to abitol, an organic alcohol commonly used in paper and other products. Panitz Dep. at 787. Plaintiff reacted positively to a prick with 1% formaldehyde.

Dr. Cohen found that plaintiff's reaction to the CCP was inconsistent. Plaintiff reacted only to scratch testing with the undersides of the yellow and white CCP sheets (not the pink). She did not react to these on prick

---

**4.** Plaintiff claims that fifty hours after the chemicals were applied, she and her roommate observed redness in the area of some patches and where ninety-seven short lines had been made with a marking pen under the patched areas. She did not photograph the reactions or report them to Dr. Belsito at the five-day check.

Dr. Panitz argues that these reactions are evidence of formaldehyde sensitization. Panitz Dep. at 419, 444. Although she does not know which substances were applied to the areas that allegedly reacted, she "assumes" that they were formaldehyde or formaldehyde-containing. *Id.* at 836:10–16, 585, 587:22. The Court does not accept conclusions from medical experts that are based on unsupported factual assumptions.

Therefore, the Court rejects this reported formaldehyde reaction as support for Dr. Panitz's diagnosis.

**5.** Dr. Goldman told Rutigliano to photograph any reaction which occurred after leaving his office. Plaintiff claims that she reacted with puffiness of the skin to the scratch test with the yellow slip of the CCP twenty-six hours after leaving Goldman's office. Panitz Dep. at 742, 749. However, she did not photograph the reaction, and no physician observed her self-reported reaction. *Id.* at 743. For the reasons stated in the previous footnote, the Court cannot accept this self-reported reaction as a valid basis for Dr. Panitz's conclusion.

testing. However, she did react to the prick test with the non-carbonless envelope. Dr. Cohen repeated the CCP testing on November 17, 1994. He found minimally positive reactions to the underside of the white and yellow carbonless and the non-carbonless envelope, but no reaction to the pink carbonless.

Dr. Cohen determined that, besides the reaction to abitol, "the other positive reactions do not appear to have clinical relevance in the setting of Ms. Rutigliano's history ... I cannot readily explain the variability in her reactions to the paper products between the two days that they were tested; however, we do note that in dermatologic allergy, patients will react differently at different times in their life as well as in different parts of their body." Cohen Report, 11/18/94.

Dr. Panitz relies upon plaintiff's positive reaction to 10% and 1% formaldehyde solution pricks and on Dr. Cohen's inconsistent CCP testing results to support her conclusion that plaintiff has formaldehyde sensitization. However, she fails to account for many significant aspects of her opinion. Perhaps most importantly, she fails to explain her rejection of the conclusions of the allergists who conducted the tests. All the dermatologists whose conclusions have been submitted to the Court concluded that plaintiff showed no clinically significant reaction to formaldehyde.[6] Nonetheless, Dr. Panitz independently re-interprets the dermatological testing.

When asked how may people in the normal population would have a skin reaction to a scratch or prick with 10% formaldehyde solution, Dr. Panitz stated "I don't know of any data to that effect." Panitz Dep. at 748. Nor did Dr. Panitz know if a prick or scratch test is more likely to cause a skin reaction than a patch test. *Id.* Dr. Panitz cannot distinguish a true positive skin test from a false positive, nor an irritant reaction from an allergic reaction. *Id.* at 716, 740, 758. Indeed, Dr. Panitz explicitly stated that she is not independently qualified to interpret dermatological testing. *Id.* As she explained: "Dermatology is not my field." *Id.* Dr. Panitz repeatedly stated that in inter-

preting plaintiff's tests, she would have to defer to the judgment of Dr. Cohen. *Id.* at 758, 716, 717, 721, 748, 758, 787. However, as noted above, Dr. Cohen determined that plaintiff's only clinically significant test result was her reaction to abitol.

On this record, Dr. Panitz has failed to convince the Court that her interpretation of Rutigliano's skin test results would be helpful to the jury. Dr. Panitz's only explanation for the vast majority of plaintiff's test results, which showed no sensitivity to formaldehyde, was "variability," which may occur for "a lot of reasons." *Id.* at 755–56. However, as Dr. Panitz does not know the rules of false positive, or false negative, of the tests she purports to interpret, her opinion that plaintiff's negative tests are unimportant is not reliable. By Dr. Panitz's own admission, she does not have the necessary information or experience to second-guess the opinions of the testing dermatologists, who uniformly concluded that plaintiff is not sensitized to formaldehyde.

*Blood Testing*

Plaintiff's blood has been tested three times for the presence of formaldehyde antibodies. On one of these three occasions, the test was positive. Dr. Panitz relies upon this test to support her conclusion that Rutigliano is sensitized to formaldehyde. Dr. Panitz explained at deposition that the negative tests did not alter her diagnosis. Panitz Dep. at 69. She explained: "The diagnosis of formaldehyde sensitization at this time in science is really based almost entirely on history with supporting evidence from the laboratory." *Id.* Under this method, Dr. Panitz explained, negative tests are disregarded as "not helpful," because they may have been taken when the subject is "remote from exposure." *Id.* However, Dr. Panitz did not have information regarding plaintiff's level of formaldehyde exposure at the time of any of the tests. Nor did Dr. Panitz provide any support for a diagnostic method that accepts only results that support a specific conclusion. *Daubert,* 43 F.3d at 1319 (expert must show that unorthodox method practiced

---

6. No report has been submitted from Dr. Goldman, the dermatologist who performed plaintiff's

positive prick test to the 10% formaldehyde solution.

by at least a minority of scientists in the relevant field).

*Spirometry*

Dr. Panitz also had lung function testing (spirometry) performed on plaintiff on numerous occasions. At her original examination of plaintiff, on April 12, 1988, Dr. Panitz conducted spirometry and determined that plaintiff's lungs functioned normally.[7] On two occasions, testing has produced a positive result. On June 14, 1988, Dr. Burton Cohen conducted an unblinded challenge with CCP taken from Dr. Cohen's office stock. Dr. Cohen "activated" the CCP and asked plaintiff to inhale from it for thirty seconds. Although Dr. Cohen could have performed a blinded challenge (where plaintiff would not have known that she was inhaling from activated CCP), he discussed that option with Dr. Panitz, and decided not to do so. Cohen Dep. at 30–31. The results of the test were not as high as plaintiff's "unchallenged" spirometry. Id. at 41. However, Dr. Cohen did not reach a conclusion as to whether the CCP exposure had a restrictive effect on plaintiff's airways. *Id.* at 42. He did not diagnose plaintiff with asthma. *Id.*

Dr. Panitz has been unable to support the methodology utilized by Dr. Cohen. The type of CCP used by Dr. Cohen, and its chemical makeup, is unknown to Dr. Panitz. Additionally, Dr. Panitz does not contest that spirometry results are effort-dependent. Cohen Dep. at 17–19. Even if a patient does not intend to skew the test results, fear or other inherent psychological attitudes can result in incorrect test values. *Id.* at 19. Dr. Cohen told plaintiff that she was inhaling from activated CCP. *Id.* at 43. Only two days before, plaintiff had been told by Dr. Panitz that her long history of physical and mental ailments had been caused by CCP exposure. In the absence of a contrary explanation by Dr. Panitz, the Court must conclude that this method of testing, using CCP whose contents were unknown and failing to use "blinding," was not reliable.

Plaintiff had a borderline positive asthma test, known as a methacholine challenge, on

June 12, 1991. Rose Goldman Dep. at 64. A methacholine challenge cannot reveal the cause of asthma. Panitz Dep. at 152–53.

Plaintiff has never had an inhalation challenge with formaldehyde.

*Other Possible Sources of Formaldehyde Exposure*

Even if Dr. Panitz had utilized reliable methods to conclude that plaintiff suffers from formaldehyde sensitization, her opinion that this sensitization was caused by plaintiff's use of CCP at Metro is unreliable. Dr. Panitz has not conducted an analysis of plaintiff's home or work environments in order to determine other possible sources of formaldehyde exposure. Nor has she been able to conclude with assurance that plaintiff's alleged sensitization began while she worked at Metro, rather than at some earlier point. Because of these deficiencies, Dr. Panitz's testimony would not assist the trier of fact in making an accurate determination of the cause of plaintiff's alleged injury.

The record is rife with evidence of sources of formaldehyde to which plaintiff was exposed at various times of her life. Rutigliano began smoking at age 13, and eventually smoked up to one pack of cigarettes a day until she quit at age 18. Rutigliano Dep. at 64–66. Over the years, plaintiff has been in contact with friends, relatives, co-workers, and roommates who smoked. *Id.* at 63–64, 406. She worked in an office with a smoker prior to working for Metro. *Id.* at 406. At Metro, she shared an office environment with many heavy smokers (Gillespie Dep. at 35), and plaintiff often complained about the smoke. Melone Dep. at 12. While acknowledging that primary and secondary cigarette smoke contain very high concentrations of formaldehyde, Dr. Panitz has failed to explain why she believes that Rutigliano reacted to formaldehyde released from CCP as opposed to formaldehyde introduced into the air through cigarette smoking.

Dr. Panitz has also failed to eliminate as a possible formaldehyde source new construction and furnishings to which plaintiff was

---

7. Plaintiff has also had normal lung function tests on June 14, 1988, February 21, 1990, April 5, 1990, September 25, 1990, and September 28, 1990. Defendant's Appendix at 429, 1072–74, 379, 1063–65, 1067, 1068–71.

exposed while working at Metro. In her original office, plaintiff was exposed to wall-to-wall carpeting, fabric-covered foam panels, formica counter tops, and paneling. Rutigliano Dep. at 594, 597; Melone Dep. at 66. During late 1984, plaintiff moved to a newly renovated work area, which contained new building materials, paint, and carpeting. Rutigliano Dep. at 595, 1685. As an occupational health physician at McGraw Hill Co., Dr. Panitz determined that exposure to these types of materials can cause the types of symptoms suffered by plaintiff. Paul J. Lioy & Elaine B. Panitz, *Indoor Air Pollution*, 85 New Jersey Medicine 921 (Nov. 1988). Dr. Panitz has also testified that building materials, auto exhaust and other substances to which Rutigliano may have been exposed have caused formaldehyde sensitization. Panitz Dep. at 25, 27, 298–99, 667–68, 672; Panitz Dep. in *Olszewski v. Biological Research Systems*, 4/17/93 at 16 (Defendants' Appendix at 339). However, she has failed to explain why these formaldehyde sources could not have caused the sensitization which she believes plaintiff suffers.

Indeed, Dr. Panitz has not analyzed, or even attempted to analyze, plaintiff's office environment at Metro. Although she has undertaken a detailed analysis of the environment in other cases in which workers suffered symptoms similar to plaintiff's, she argues that where she learns that a worker has handled CCP, she need not undertake this inquiry. Panitz Aff. at ¶ 4, Plaintiff's Appendix at 97. She has also failed to account for plaintiff's exposure to myriad chemicals present in her working environment at Metro.[8]

Rutigliano worked at Rockaway Fuel Oil Corporation from June 1982 through December 1983 (prior to working at Metro). While working at Rockaway, Rutigliano suffered pain in her left anterior chest which awakened her at night and lasted one to two hours. Panitz Dep. at 476–77. She also suffered respiratory problems, acute tracheitis and discomfort in the upper chest

with coughs, epigastric pain, and skin lesions. *Id.*

Dr. Panitz testified that the symptoms Rutigliano suffered at Rockaway are consistent with sensitization, although they may only indicate irritation. *Id.* at 557. She specifically stated that Rutigliano's recurrent tracheal infections could be evidence of slowly-developing sensitization to something in her environment at Rockaway. *Id.* Furthermore, "[i]t's possible something in the air was bothering her and she was using carbonless carbon paper, perhaps 20 minutes a day, at Rockaway." *Id.* at 558. Dr. Panitz places the beginning of plaintiff's formaldehyde sensitization at Metro, and not Rockaway, because her respiratory problems allegedly increased at Metro and because the skin problems plaintiff suffered at Rockaway are not consistent with skin sensitization. *Id.* at 557–58. However, by her own testimony, Dr. Panitz's methodology is unable to pinpoint the beginning of sensitization. Panitz Dep. at 472–73.

### Conclusion

After thorough review of the record, the Court concludes that Dr. Panitz's testimony is not reliable, and would not assist a jury in reaching an accurate determination of the nature and cause of plaintiff's illness. The proffered expert testimony is therefore inadmissible under Fed.R.Evid. 702. The Supreme Court has explained: "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796 (citation omitted). Dr. Panitz has failed to abide by this method, both because her conclusions are, in large part, not testable, and because she disregards, without analysis, indications that her conclusions may be incorrect. Although Dr. Panitz could have supported her atypical methods by demonstrating that she has followed the scientific method as practiced by (at least) a recognized minority of scientists

---

**8.** Plaintiff's work area adjoined a garage and yard where chemicals, including formaldehyde, were transferred and occasionally spilled. Michael Gillespie Dep. at 6, 9, 12, 59–60. Chemical vapors often lingered in plaintiff's work area, and she was exposed to vapors on a daily basis. Panitz Dep. at 48–49.

in her field, *Daubert,* 43 F.3d at 1319, she has failed to do so. The Court cannot permit her testimony to be presented to a jury.

The testimony of Dr. Panitz aside, plaintiff provides no evidence that defendant's CCP caused her injuries. Therefore, plaintiff cannot support an essential element of her tort claims, and summary judgment will be entered in favor of defendants. Given this disposition, the Court need not reach the admissibility of the expert testimony proffered by Dr. Godish.[9]

---

9. Dr. Godish concluded that the symptoms plaintiff suffered while working at Metro resulted from exposure to vapors and/or contact irritants associated with CCP, and most likely from exposure to formaldehyde released from CCP. Godish Report, 5/23/91 at 4. Dr. Godish did not conclude that plaintiff suffers from formaldehyde sensitization, and plaintiff has not sought to admit Dr. Godish's conclusion. *See* Plaintiff's Brief in Opposition.

Plaintiff seeks only to admit testimony from Dr. Godish that CCP, when used, emits a "plume" of concentrated formaldehyde gas. *Id.* Because plaintiff cannot support the proposition that such a "plume" can or did cause her to become sensitized to formaldehyde, the admissibility of Dr. Godish's testimony is irrelevant to defendants' summary judgment motion.