Gordon, Robert B., J.
Presented for decision are a pair of defense motions to strike expert opinions that have been offered in support of the plaintiffs claim for legal malpractice. These motions have been filed at the express invitation of the Court, which in a Procedural Order dated September 1, 2015, and in a follow-on hearing with counsel, expressed substantial concerns regarding the adequacy of the legal and medical malpractice expert opinions that the plaintiff had relied upon in opposition to a previously filed motion for summaryjudgment. In lieu of taking immediate action on the defendants’ Rule 56 motion, the Court ordered the plaintiff to make her two belatedly disclosed experts available for depositions to be conducted at plaintiffs expense. In this way, the parties could address, and the Court evaluate, the precise factual and legal grounds for the plaintiffs proffered expert opinions under the gating principles of Daubert/Lanigan.
The parties appear to have adhered to the Court’s directive, having taken and completed the depositions of Diane Paolicelli, Esq. and Richard Braver, D.P.M., the plaintiffs legal and medical negligence experts respectively.[1] The defendants have now filed a Motion to Strike Plaintiffs Legal Expert and a companion Motion to Strike Plaintiffs Podiatry Expert. Each motion is premised on the contentions that the subject expert (1) is unqualified by credentials and experience to offer the substantive opinions he or she has; and (2) has offered an opinion resting upon impermissible speculation and conjecture, rather than competent *435 evidence and reliable analytic method. The Court addresses these motions in turn.
MOTION TO STRIKE PLAINTIFF’S LEGAL EXPERT
The defendants have moved to strike the testimony of plaintiffs legal expert (Diane Paolicelli, Esq.) in its entirety, because Ms. Paolicelli is purportedly unqualified by education and experience to render an informed opinion regarding the standard of care governing a Massachusetts lawyer who prosecutes a medical malpractice action. In the alternative, the defendants have moved to strike those portions of Ms. Paolicelli’s disclosure which opine that, had Dr. King not prevailed at the summary judgment stage (on account of Attorney Satin’s claimed negligence in allowing the tort statute of limitations to run), Dr. King’s insurer would have settled the medical malpractice claim against him for between $1 million and $3.75 million. The defendants contend that such a causation/ damages opinion rests upon speculation rather than factual evidence and/or demonstrated analytic method.
It is the task of the Court to exercise “an important gatekeeping function with respect to expert testimony,” and to exclude from the trial evidence from an expert who is “unqualified” or whose opinion “lacks reliability.” Commonwealth v. Lanigan, 419 Mass. 15, 25-26 (1994). This “entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.” Id. at 26 (quoting Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993)). “The ultimate test for [admissibility of expert evidence] is the reliability of the theory or process underlying the expert’s testimony.” Case of Hicks, 62 Mass.App.Ct. 755, 760 (2005) (quoting Commonwealth v. Lanigan, 419 Mass. at 24).
Regarding the defendants’ challenge to Ms. Paolicelli’s qualifications, the gravamen of such challenge is the fact that Ms. Paolicelli is a non-Massachusetts lawyer, has never litigated a medical malpractice case in Massachusetts, and has never previously been qualified as an expert in any jurisdiction. On this basis, the defendants argue that Ms. Paolicelli cannot be considered sufficiently “expert” to offer an opinion regarding the standard of care applicable to a Massachusetts lawyer confronting a malpractice statute of limitations issue governed by Massachusetts law. The Court does not agree.
The record discloses that Ms. Paolicelli has been practicing law for 35 years. She is an honors graduate of New York University Law School, and a published editor of its Law Review. Ms. Paolicelli has specialized in medical malpractice and other species of complex civil litigation, and has secured several multi-million dollar verdicts on behalf of personal injuiy clients. Ms. Paolicelli is a member of several bar associations, and has lectured frequently on a range of topics in tort litigation. Although her experience in Massachusetts is concededly limited, Ms. Paolicelli handled at least one substantial case in the Commonwealth raising a statute of limitations issue similar to the one presented in the case at bar. Perhaps more to the point, Massachusetts courts routinely allow out-of-state experts to opine on standards of care applicable to practitioners in the Commonwealth where, as here, distinctions in the law from one state to another are not material to the liability question subjudice. Indeed, the SJC recently reaffirmed the principle that experts may give opinions about specialties other than their own. See Reckis v. Johnson & Johnson, 28 N.E.2d 445, 462 (Mass. 2015). In this regard, the Court observes that, while representing Mr. Lavina in the underlying medical malpractice case, the defendants themselves engaged the services of a New Jersey doctor (Christopher Connor, M.D.) to opine on the standard of care governing the medical performance of a Massachusetts podiatrist.
The defendants’ criticisms of Ms. Paolicelli’s professional credentials and legal experience are noted. As is the fact that Ms. Paolicelli has never before been qualified as an expert, and thus has no testimonial experience in malpractice litigation.[2] But such criticisms bear at most upon the weight to be accorded her testimony; and, however well taken the criticisms might be, they will not foreclose her qualification as a trial expert altogether. See Blake v. Avedikian, 412 Mass. 481, 483 (1992) (“the extent of [an expert’s] training and experience would bear only on the weight that should be given to his testimony . . . and not its admissibility”) (quoting Commonwealth v. Schulze, 389 Mass. 735, 740 (1983)). This aspect of the Defendants’ Motion to Strike Plaintiffs Legal Expert, therefore, must be denied.
The Court turns next to the substance of the opinion Ms. Paolicelli has tendered. The vast majority of this witness’s testimony is addressed to various acts and omissions committed by Attorney Satin that Ms. Paolicelli submits deviated from the standard of care governing a medical malpractice lawyer. Although the defendants selectively assail certain aspects of these proffered opinions (in particular those pertaining to Attorney Satin’s knowledge and handling of the Bonner Note), a number are not addressed at all; and those arguments that are advanced in this regard speak to the weight rather than admissibility of the subject opinions. Because Ms. Paolicelli’s standard of care-related opinions fall comfortably within the purview of what an experienced medical malpractice lawyer might offer in the way of expert testimony, and rest upon a satisfactory foundation in the evidence, see Lanigan, 419 Mass, at 26, the Court will leave them undisturbed. It will be for the defendants to challenge these opinions through cross examination and through the introduction of contradictory evidence at *436 trial. See Commonwealth v. Sands, 424 Mass. 184, 186 (1997) (“expert’s qualifications and the logical basis of the testimony can be effectively tested through cross examination and rebuttal evidence”).
More worrisome, however, is the opinion Ms. Paolicelli tenders in the area of causation and damages. It is, of course, well settled that a legal malpractice claim requires proof that the plaintiff “probably would have obtained a better result had the [defendant] attorney exercised adequate skill and care.” Poly v. Moylan, 423 Mass. 141, 145 (1996). “Proximate cause is an essential element[,] . . . [and] in some circumstances, expert testimony is necessary to prove the element of causation in a legal malpractice claim.” Atlas Tack v. Donabed, 47 Mass.App.Ct. 221, 226 (1999). Accord Harlow v. Chin, 405 Mass. 697, 702 (1989) (“causal link generally must be established by expert testimony that the injury was more probably than not a result of the [defendant’s] negligence”). Here, the plaintiff purports to satisfy the causation element through the testimony of Ms. Paolicelli, who opines that, but for the negligence of Attorney Satin in allowing summary judgment to enter against the Lavinas’ medical malpractice claim, Dr. King’s insurance company would likely have settled the case for between $1 million and $3.75 million. The Court is troubled by this aspect of Ms. Paolicelli’s opinion, which the record reveals to rest on highly conjectural supposition rather than reliable legal analysis.
The evidence adduced during Ms. Paolicelli’s deposition demonstrates that Ms. Paolicelli has no personal experience with Dr. King’s insurer, no familiarity with the carrier’s historical settlement practices, and no knowledge of whether Dr. King even had any interest at all in settling a lawsuit whose liabilify claim he had consistently derided as “insubstantial, frivolous and not advanced in good faith.” The sole factual foundation for Ms. Paolicelli’s causation and damages opinion (viz., that Dr. King’s insurer would have settled the Lavinas’ lawsuit for large sums had the suit survived summary judgment) is her assertion that “if a defense lawyer does not have an expert for a case, then the insurance company is going to want to try and settle the case for some number, preferably one that’s low ...” This assertion, however, is premised entirely on the stated assumption that Dr. King’s failure to have disclosed a testifying expert as of the time of his summary judgment filing signified that he would not have been able to obtain one for trial at all and would thus have been compelled to settle. In point of fact, the uncontradicted evidence is that Dr. King had engaged consulting experts, but the practice of his trial counsel was to defer disclosure of his testifying experts until the close of discovery. Discovery had not closed as of the time of Dr. King’s summary judgment filing; and proper expert disclosure could surely have been made at the parties’ still-unscheduled Final Pretrial Conference in accordance with Superior Court Standing Order 1-88. See generally P. Lauriat et al., Discovery, 49 Mass. Practice ¶3.5, at 238-42 (2008 and Supp. 2016). The unadorned fact that Dr. King had not disclosed a testifying expert as of the time he filed his motion for summary judgment thus cannot sustain the proposition that he would have been forced to proceed to trial without one.[3] Accordingly, inasmuch as Ms. Paolicelli’s opinion that Dr. King’s insurer would have felt compelled to settle the Lavina malpractice lawsuit on unfavorable terms rests upon an assumed fact that is not established in the evidence, the opinion is unreliable and cannot stand. See Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) (expert opinion of no value where it “is not supported by sufficient facts to validate it in the eyes of the law, or where the indisputable record facts contradict or otherwise render the opinion unreasonable”).
Even if there were a sufficiently reliable basis for the forecast that the Lavinas’ lawsuit would have been settled prior to trial had it survived summary judgment, Ms. Paolicelli expands this opinion considerably when she asserts that Dr. King’s insurer would have paid the plaintiffs between $1 million and $3.75 million. Although experts are by no means precluded from opining on the settlement value of a claim in the context of a legal malpractice action, this particular opinion does not rest upon any analytical foundation disclosed by Ms. Paolicelli. Instead, Ms. Paolicelli cites to a selective compilation of jury verdicts and settlements in cases involving below-the-knee amputations as the basis for her valuation estimate. The compilation, however, had been assembled by the plaintiffs trial counsel on a non-comprehensive basis, and Ms. Paolicelli herself acknowledged during deposition that she had virtually no personal familiarity with either its substance or the methodology underlying its creation. Ms. Paolicelli could thus not recall the names of the cases summarized in the compilation; could not identify the relevant dates or date ranges of the referenced cases; could not describe the facts of any of the summarized cases; could not distinguish which cases were medical malpractice actions from those that involved other types of personal injury claim; and, more generally, could not speak to whether the compiled cases bore any circumstantial similarity to the Lavinas’ lawsuit.[4] To call Ms. Paolicelli’s case valuation an “analysis” at all strains the meaning of the term. See Fourth Street Pub, Inc. v. Nat’l Union Fire Ins. Co., 28 Mass.App.Ct. 157, 161 (1989) (expert “must have sufficient familiarity with the particular facts to reach a meaningful expert opinion”).
Reinforcing the conjectural quality of Ms. Paolicelli’s opinion is her conclusion that Dr. King’s insurer would have settled the Lavinas’ claims against him for somewhere between $1 million and $3.75 million. The imprecision of this expansive range alone suggests speculativeness. More damning to the opinion, however, is the fact that Dr. King’s actual insurance coverage in this case was limited to $1 million *437 per claim. Evidently unaware of this fact, Ms. Paolicelli acknowledged during deposition that “insurance companies don’t settle for amounts beyond the policy.” In other words, Ms. Paolicelli has opined that, had the Lavina malpractice suit survived summary judgment, Dr. King’s insurer would have done what insurance companies never do and settled the case in a range approaching/our times its policy limit. Once again, no analysis whatsoever is offered to support such an implausible opinion.
In these circumstances, the Court concludes that Ms. Paolicelli’s causation/damages opinion rests upon impermissible speculation, and is not adequately grounded in an evidentiary foundation established by the record. The opinion, therefore, may not stand in its present form. See Mass.G.Evid. Rule 702 (expert opinion must rest on “reliable principles and methods” and not on speculation). See also LightLab Imaging, Inc. v. Axson Tech, Inc., 469 Mass. 181, 191 (2014) (“an opinion given by an expert will be disregarded when it amounts to no more than speculation or a guess from subordinate facts that do not give adequate support to the conclusion reached”). Accordingly, the Defendants’ Motion to Strike Plaintiffs Legal Expert will be ALLOWED IN PART, removing from the summary judgment record the opinion that (but for Attorney Satin’s negligence) the Lavinas’ lawsuit would have settled for an amount of money ranging between $1 million and $3.75 million.[5]
MOTION TO STRIKE PLAINTIFF’S PODIATRY EXPERT
The defendants have moved to strike the testimony of plaintiffs podiatry expert (Richard Braver, D.P.M.), arguing principally that Dr. Braver’s opinion fails to address the question of but-for causation presented by Mr. Lavina’s distinctive medical profile.[6] As the Court observed in its September 1, 2015 Procedural Order, the record discloses that Mr. Lavina experienced myriad and concurrent medical problems, each of which increased the potential for amputation to a material degree. Mr. Lavina thus suffered uncontrolled diabetes, neuropathy, morbid obesity (weighing over 400 lbs.), elevated blood glucose levels, advanced kidney disease, hypercholesterol, hypertension, and a variety of other chronic vascular and circulatory problems. Diabetes alone increases the risk of amputation 15-fold; and the blended interaction of these various co-morbidities (each of which alone correlates with a heightened likelihood of lower extremity amputation) magnifies that risk dramatically. Add to this profile a patient who, contrary to express medical directives, eschewed wearing diabetic shoes and exercised and placed weight on an already ulcerated foot, and the risks of infection and amputation were acute. For this reason, defense experts opine with some force that, under the circumstances presented, Mr. Lavina’s below-the-knee amputation was both inevitable and unavoidable.
Faced with this evidence, the Court alerted the parties to its substantial concern that Dr. Braver’s expert disclosure failed to provide an opinion that satisfactorily addressed the matter of but-for causation. That is, Dr. Braver had failed to opine in terms that, on account of Dr. King’s claimed negligence, Mr. Lavina suffered a leg amputation that he more likely than not would have avoided otherwise. Stated differently, the plaintiff bears the burden to prove that, absent the negligence attributed to Dr. King, Mr. Lavina’s various co-morbidities would not independently have caused him to suffer the condition that necessitated a below-the-knee amputation. Failing such proof, and for the reasons the defendants’ experts have asserted, the essential element of but-for causation in the medical negligence case would be lacking, and plaintiffs legal malpractice claim would fail. See Harlow v. Chin, 405 Mass. 697, 702 (1989).
Having now reviewed the parties’ expert discovery, and applying the standards of Daubert/Lanigan recited supra, the Court remains of the view that Dr. Braver’s opinion fails to present a reliable, analytical foundation for the summary assertion that Dr. King’s negligence was a legal cause of Mr. Lavina’s amputation. Central to the defendants’ causation defense is the contention that the amputation suffered by Mr. Lavina was the by-product of multiple and chronic medical conditions pre-dating and unrelated to the negligence attributed to Dr. King. The defendants’ experts thus opine that the combination of these risk-enhancing afflictions, together with Mr. Lavina’s serial failure to heed physician instructions in the management of his health and care, caused the leg amputation and would in all events have resulted in it even in the absence of negligence on the part of Dr. King. By way of response, however, Dr. Braver has tendered an opinion addressed almost entirely to standard of care-related criticisms of Dr. King’s treatment of Mr. Lavina. All but ignored are the pointed causation concerns articulated by the Court in its Procedural Order.
Having reviewed Dr. Braver’s deposition testimony, the Court is unable to discern any substantive analysis (that is, the application of a scientific method to clinical facts) to support his conclusion that Dr. King’s negligence was the but-for cause of Mr. Lavina’s leg amputation. To sustain such a conclusion, Dr. Braver would necessarily have to have performed a differential diagnosis, or its equivalent, in order to rule out factors and conditions unrelated to Dr. King’s treatment that might independently have caused the infectious foot ulcer that necessitated Mr. Lavina’s leg amputation. The record, however, contains no evidence that Dr. Braver ever performed any such diagnostic analysis. To the contrary, the deposition *438 testimony presented to the Court reflects a stubborn unwillingness on the part of Dr. Braver to respond to questions addressing the extent to which Mr. Lavina’s pre-existing infirmities caused his below-the-knee amputation.[7]
The importance of performing differential diagnosis in cases where the presence of multiple causes of injury calls into question the plaintiffs proof of causation is well settled. As this Court wrote in Hammond v. Bedford Great Rd. CVS, 9 Mass. L. Rptr. 104, 1998 Mass. Super. LEXIS 546 (1998) (Neel, J.):
Courts have insisted time and again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis. This does not mean that a medical causation expert must eliminate all possible causes of an alleged condition, nor does it mean that the expert must always make a physical examination of the plaintiff or conduct a battery of tests aimed at eliminating competing causes of the plaintiffs condition. Nevertheless, it is true that at the core of the differential diagnosis is a requirement that experts at least consider alternative causes—this almost has to be true of any technique that tries to find a cause for something.
Hammond, id. at *22-23 (citations and quotations omitted). In allowing the Defendants’ Motion to Exclude Certain Expert Testimony, the Court declared that “expert testimony concerning causation will not assist the trier of fact in reaching an accurate result unless it has eliminated alternative explanations for the plaintiffs illness.” Id. at *25 (quoting Rutigliano v. Valley Business Forms, 929 F.Sup. 779, 786 (D.N.J.), aff'd, 118 F.3d 1577 (3d Cir. 1997)). In language particularly apt for the case at bar, the Court held that:
[W]hen an expert engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why his or her conclusions remained reliable, or [if] the defendants pointed to some likely cause of the plaintiffs illness other than the defendants’ actions and the expert offered no reasonable explanation as to why he or she still believed that the defendants’ actions were a substantial factor in bringing about that illness, then the testimony should be excluded as unreliable.
Hammond, id. at *25 (quoting In re Paoli R.R. Yard Litigation, 35 F.3d 717, 760 (3d Cir. 1994) (emphasis added).
Judge Fabricant reached a similar conclusion in Aziz v. French, 10 Mass. L. Rptr. 152, 1999 Mass.Super. LEXIS 223 (1999), striking a medical expert’s causation opinion that failed to account for other factors that contributed to the subject injury. The Court wrote:
Dr. Jacir offers no indication whatever how he reaches his conclusion that the assumed sudden increase in pressure caused injury in this particular case. Althoughhe acknowledges other causative factors, both in general and in this case, he provides no analysis of the role of the various factors or the interaction among factors.
Id. at *17 (emphasis added, citations omitted).
Like the expert in Hammond, Dr. Braver has been shown numerous likely causes of the condition resulting in Mr. Lavina’s leg amputation (co-morbidities predating and unrelated to the negligence that has been ascribed to Dr. King); yet Braver’s opinion takes no account of these alternative causes. Not by differential diagnosis, nor by any other analytical method, that would either eliminate these alternative factors as the cause of Mr. Lavina’s amputation or demonstrate that Mr. Lavina would not likely have suffered an amputation absent Dr. King’s particular negligence.[8] Similarly, like the expert in Aziz, Dr. Braver acknowledges in general terms the causative contributions of various factors unrelated to Dr. King, but then provides no analysis of the role actually played by these factors. He simply proffers the “I say so” conclusion that, but for the negligence of Dr. King, Mr. Lavina would likely have been referred to a vascular surgeon in time to avoid a leg amputation. Without such analysis, however, Dr. Braver’s conclusorily asserted causation opinion lacks the foundational reliability required by Daubert/Lanigan. See Smith v. Bell Atlantic, 63 Mass.App.Ct. 702, 719-20 (2005) (affirming trial judge’s discretionary exclusion of medical causation expert who failed to conduct “differential diagnosis” analysis of alternate causes of injury).
In her Opposition to Defendants’ Motion to Strike Plaintiffs Podiatry Expert, plaintiff quarrels with defendants’ use of the term “differential diagnosis.” Plaintiff insists that “differential diagnosis” refers only to “the distinguishing of a disease or condition from others presenting similar symptoms.” Since amputation is a form of corrective surgery rather than a disease, plaintiff argues, differential diagnosis was not required to validate Dr. Braver’s causation opinion. This argument does not persuade. As the above-referenced decisions make clear, courts routinely apply the concept of differential diagnosis in the broader context of harm causation, and not in the unduly cramped manner urged by the plaintiff. Regardless, it is acknowledged that amputation is not itself a disease, and neither the defendants nor their medical experts have suggested otherwise. But the analysis Dr. Braver was called upon to conduct in this case needed to address the question of whether the medical conditions afflicting Mr. Lav-ina that caused him to require an amputation were proximately caused by negligence attributable to Dr. King: and, if they were, would other concurrent *439 conditions for which Dr. King was not responsible have in all events produced the same outcome. Whether expressed in the vocabulary of “differential diagnosis” or not, this is the analysis that is fundamentally essential to a reliable causation opinion in the present case. See Adam v. Stone, 2015 Mass.App. Unpub. LEXIS 485, at *1-3 (May 22, 2015) (rejecting expert’s causation opinion as “raw speculation” when expert failed to account for patient failure to adhere to physician recommendations). This is the analysis that Dr. Braver has undeniably not performed.[9]
For the above-stated reasons, therefore, Defendants’ Motion to Strike Plaintiffs Podiatry Expert shall be ALLOWED IN PART—removing from the summaryjudgment record that portion of the opinion which states that Dr. King’s purported negligence was a cause of Mr. Lavina’s leg amputation, and that Mr. Lavina would likely have been spared that outcome had Dr. King complied with the governing standard of podiatric care.

 The undersigned states “appears to have” because there was evidently a disagreement concerning the defendants’ service of a subpoena duces tecum (by which they sought to have the plaintiffs two experts produce in connection with the noticed depositions those documentary materials that they reviewed and relied upon for their opinions). The defendants transmitted these document subpoenas to plaintiffs counsel, who proceeded to disregard them entirely (and not even forward them to the two out-of-state experts scheduled for deposition) because they had not been accompanied by a Court-endorsed commission or letter rogatory. As a result, Dr. Braver and Attorney Paolicelli never received the subpoenas, produced none of the requested documents, and were limited in their ability during deposition to answer questions addressed to the documentary sources of their opinions. The Court regards this sort of gamesmanship by plaintiffs counsel as too clever by half, and contrary to the spirit and intentions of its Procedural Order. Having formally directed the plaintiff to produce her designated experts for deposition, an Order to which no protest was registered and from which no interlocutory appeal taken, there could be little question that the Court had already declared these witnesses to be subject to its subpoena power and authority. There should thus have been no need for the defendants to secure, or the Court to issue, a letter rogatory bywhich the plaintiffs experts could be compelled to produce relevant documents. That bridge had already been crossed. (And in the unlikely event that either or both of these compensated experts balked at complying with the Court’s order for deposition, it was incumbent upon counsel to bring that fact to the attention of the defendants in a timely manner so that corrective steps could be taken. For reasons that defy understanding, this never occurred.) Particularly in light of the fact that production of all documents that were reviewed and relied upon is a standard feature of expert deposition practice, it is more than a little disappointing to see that the defendants were forced to depose the plaintiffs experts without the benefit of the documents they had subpoenaed. At a minimum, the plaintiff and/or her experts should have registered a Rule 45 objection, or sought a protective order, in respect of the subpoenas so that the defendants could have filed a motion to secure their enforcement prior to the scheduled deposition dates. Disregarding the subpoenas in stealth was disrespectful to opposing counsel and to the Court, and better is expected from practitioners of the caliber of the plaintiffs.

 On this point, however, the undersigned observes that the absence of prior forensic qualification cannot logically be an impediment that bars qualifying Ms. Paolicelli as an expert in the case at bar. If it were, no one could ever be qualified as an expert for the first time, and the species would slide into extinction.

 Plaintiffs argument is especially bewildering when one recalls that the defendants’ summaryjudgment motion in the case at bar was derailed by the fact that Ms. Lavina had not disclosed her experts as of the time that Lubin & Meyer and Attorney Satin filed such motion. Plaintiff took the position, rightly, that discovery had not closed and a Final Pretrial Conference had yet to be scheduled; and, on this basis, she insisted on the right to offer expert opinions even though an entire Rule 56 motion had been briefed on the understanding that plaintiff had no such expert evidence to support her claim. The Court agreed, and the summaryjudgment process was effectively restarted so that expert issues at the heart of the case could be addressed in discovery and in Rule 56 briefing. In these circumstances, the plaintiff speaks with forked tongue when she argues that the failure of Dr. King to have disclosed his liability expert as of the time he moved for summaryjudgment (on a statute of limitations ground) meant he would be barred from making such a disclosure regarding the case’s substantive merits at any point thereafter. Plaintiff knows from her own experience that this is not the case.

 Any number of factually distinguishing features of these cases could have materially affected their appropriateness as comparators for purposes of Ms. Paolicelli’s valuation opinion. The age of the victims, how long they were hospitalized, how long they lived with their conditions, what kind of lost wage income or earning capacity (if any) they suffered, and whether the circumstances leading up to the amputation involved acute physical and/or mental pain and suffering are all matters that surely affected the verdicts and settlements reached in the cases compiled for Ms. Paolicelli. Ms. Paolicelli, however, evidently gave no consideration to these factors, and how they compared to the case at bar, when formulating her opinion as to what Dr. King’s insurer would have likely paid to settle the Lavinas’ claims.

 For the avoidance of doubt, the Court notes that Ms. Paolicelli’s opinion may be relied upon more generally as evidence of causation and harm, two of the essential elements of a malpractice claim. Although her conclusoiy forecast of what Dr. King’s insurance company would have done with the Lavina case had it survived summary judgment is insufficiently reliable to meet the requirements of Daubert/Lanigan, see supra, it is self-evident that the plaintiffs were harmed by virtue of the court’s dismissal of their claims prior to trial. A potentially viable set of medical negligence claims was rendered non-viable, a form of harm or “loss” under any fair construction of the term. To the extent Attorney Satin may, by his negligence, be assigned responsibility for such loss, those elements of malpractice liability [viz., injury and causation) are made out. It remains, however, for the plaintiff to demonstrate at trial recoverable money damages in respect of such loss—whether a settlement not achieved or a verdict not secured—unaided though she will be by an expert opinion from Ms. Paolicelli addressed to same.

 Although the defendants have additionally argued that Dr. Braver (who is not a vascular surgeon) is unqualified to opine that a vascular procedure would have spared Mr. Lavina the amputation had Dr. King been more attentive to his care, the Court does not accept this argument and sees no need to address it at length. Dr. Braver is a plainly qualified podiatrist and podiatric surgeon, with substantial experience treating patients presenting with conditions comparable to Mr. Lavina’s. The fact that adherence to the standard of care might have entailed referral to avascular surgeon, with whose practices Dr. Braver is surely familiar, does not mean that Dr. Braver is offering testimony outside the scope of his expertise. *440 Radiology experts, for example, commonly opine on the consequences of failing to diagnose cancer, and the likelihood of patient survival had a surgical referral been made in a timely fashion. They are not opining outside the scope of their expertise, even though they are not qualified to perform the surgery itself.

 Dr. Braver at one point conceded that Mr. Lavina’s other diseases, conditions, and non-compliance with physician instructions were “contributing factors” in the amputations he suffered. But Dr. Braver deflected other questions that would have revealed whether, in his opinion, these independent factors would in all events have brought about the amputations, irrespective of any negligence on the part of Dr. King. Such questions, of course, go to the very heart of but-for causation.

 This deficiency does not, as Plaintiff suggests, affect only the weight to be accorded to Dr. Braver’s opinion. To the contrary, Dr. Braver’s failure to support (by medical analysis or other scientific method) his contention that Dr. King’s negligence was a but-for cause of Mr. Lavina’s amputation completely negates the legitimacy of this portion of his opinion. See Lanigan, 419 Mass. at 26 (expert must apply proven and reliable methodology to offer admissible opinions).

 At hearing, plaintiff sought to turn this analysis on its head, arguing that holding her expert to a standard of but-for causation was not appropriate. Given the multiplicity of conditions that could possibly have resulted in Mr. Lavina’s leg amputation, it is urged, plaintiff should be relieved of having to prove but-for causation and should instead be held to the lesser standard of demonstrating that Dr. King’s negligence was a “substantial contributing factor” in causing the amputation. The Court does not agree. “Substantial contributing factor” is a standard that may be applied where but-for causation cannot be established with precision, such as in cases with multiple tortfeasors whose actions may independently have produced the subject harm. See, e.g.,J. Renehan, “A New Frontier: The Loss of Chance Doctrine in Medical Malpractice Cases,” 53 Boston Bar J. 14,17 (May/June 2009) (“Are the defendants correct in their assertion that ‘but for’ causation has replaced the ‘substantial contributing factor’ test, even in cases where loss of chance is not alleged? The answer is yes. The [SJC] has relegated the ‘substantial contributing factor’ test to second place, to be used only when it is literally not possible to make a precise calculation of causation among joint tortfeasors”). See also Matsuyama v. Birnbaum, 452 Mass. 1, 30-31 (2008) (‘The ‘substantial contributing factor’ test is useful in cases in which damage has multiple causes, including but not limited to cases with multiple tortfeasors in which it may be impossible to say for certain that any individual defendant’s conduct was a but-for cause of the harm, even though it can be shown that the defendants, in the aggregate, caused the harm”). In the present case, but-for causation connecting Dr. King’s claimed negligence to Mr. Lavina’s leg amputation may, as a factual matter, be lacking: but the theoretical provability of such causation is by no means illusory. The defendant has produced expert opinion that Mr. Lavina’s leg amputation resulted from the confluence of multiple and chronic co-morbidities, and that the negligence attributed to Dr. King alone would not have produced this outcome. In these circumstances, the burden falls to the plaintiff to apply a differential analysis demonstrating that, even in the absence of such concurrent causes, Dr. King’s negligence would have produced the amputation. This is not asking the plaintiff to prove the impossible. It is simply requiring her expert to substantiate with analysis the causation opinion he proposes to offer.